IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

FLORENCE E. OMACHONU,

                Plaintiff,                OPINION & ORDER

  v.

                                                          15-cv-69-wmc

DENNIS J. SHIELDS,
ELIZABETH A. THROOP
and ALISON B. BUNTE

                Defendants.

---

      In this suit brought under 42 U.S.C. §§ 1981 and 1983, plaintiff Florence E. Omachonu asserts claims of discrimination on the basis of race and national origin against defendants Dennis J. Shields, Elizabeth A. Throop, and Alison B. Bunte, all of whom held positions of authority at the University of Wisconsin-Platteville and allegedly participated in decisions to deny Dr. Omachonu tenure and terminate her employment. Currently before the court is defendants' renewed motion to dismiss.[1] First, the defendants seek dismissal of all 42 U.S.C. § 1981 claims based on the premise that § 1983 provides the exclusive remedy for the violations alleged. Additionally, defendant Alison Bunte contends that: (1) plaintiff's amended complaint fails to allege facts establishing her personal involvement in the alleged discrimination; and (2) she is entitled to qualified immunity in any event.

---

[1] Defendants initially filed a motion to dismiss (dkt. #9), in response to which plaintiff filed an amended complaint (dkt. #12). Defendants then filed a renewed motion to dismiss, representing that their initial motion and brief were applicable to the amended complaint as well. (Dkt. #18.) Thus, the original motion to dismiss requires no further discussion and will be denied as moot.

For reasons more fully explained below, the court will grant defendants' motion to dismiss plaintiff's § 1981 claims because that section provides no separate remedy for conduct by state actors independent of the remedies provided by § 1983.  However, the court will deny the motion to dismiss with respect to the claims against Bunte.  At this stage in the proceedings, plaintiff must only sufficiently state a cause of action and "allege—not prove—the deprivation of a constitutional right."  *Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008).  Whatever factual hurdles still await plaintiff, her amended complaint satisfies this lower bar.

## ALLEGATIONS OF FACT[2]

### I. The Parties

Plaintiff Florence E. Omachonu, Ed. D., was hired as an assistant professor in the School of Education at the University of Wisconsin-Platteville in December of 2007, where she taught until May of 2014.  Omachonu is a native of Nigeria and African American by race.

Throughout this same period to the present, defendant Dennis Shields was and is the Chancellor and chief executive of the University of Wisconsin-Platteville. Chancellor Shields is responsible for screening candidates for promotion and tenure, as well as making recommendations on tenure to the Board of Regents.

---

[2] For purposes of this decision, the court accepts, as it must, all of the well-pled factual allegations in the amended complaint as true, drawing all inferences in Dr. Omachonu's favor. *Killingsworth v. HSBC Bank Nev. N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

Since June of 2012, defendant Elizabeth Throop has been the Dean of the College of Liberal Arts and Education at the University of Wisconsin-Platteville. Dean Throop is responsible for the administration of the College of Liberal Arts.

Through July of 2011, defendant Alison Bunte was the Director of the School of Education at the University of Wisconsin-Platteville. As Director, she was responsible for staffing and course scheduling.

## II.     Dr. Omachonu's Employment and Alleged Discrimination by Bunte

In 2010, the former Dean of the College of Liberal Arts and Education at the University of Wisconsin-Platteville, Mittie Van Herder, wrote to the Vice Chancellor and Provost to recommend that then Assistant Professor Omachonu be retained for the 2011-2012 academic year, on the conditions that she continue her progress towards a doctoral degree and achieve progress in specific areas of teaching effectiveness.

In June of 2010, School of Education Director Bunte wrote to Omachonu about concerns raised in student evaluations "regarding the clarity of [her] instruction." Omachonu alleges that Bunte only reviewed disgruntled students' evaluations, and that she then compared these negative evaluation scores against the scores given to faculty members who were not similarly situated.

Sometime after the June 2010 memo, Bunte assigned Omachonu to teach a larger number of classes; Omachonu alleges her workload was not comparable to the number of classes Bunte assigned to other, similarly situated faculty members. Bunte also allegedly changed Omachonu's schedule and responsibilities at different times without her input,

3

while treating other, similarly situated faculty members differently. Around this same time, Omachonu first raised concerns that Bunte was discriminating against her. Omachonu met with other university administrators, but the issues were apparently not resolved successfully. Sometime in 2010 or early 2011, Bunte stepped down from her director position.[3]

In February of 2011, the new Director of the School of Education, Karen Stinson, wrote to Omachonu (1) affirming "her progress towards tenure"; (2) commending "her past efforts"; and (3) noting that "she must complete her doctorate before 2012 (her tenure year)." (Am. Compl. (dkt. #12) ¶ 28). Stinson also advised Omachonu to "review her syllabus to ensure greater clarity for students" and "continue to improve her teaching skills." (*Id.*) In April of 2011, Chancellor Shields unconditionally reappointed Omachonu for the 2012-2013 academic year.

In early 2012, Omachonu received her doctoral degree in education. After the completion of her doctorate, Chancellor Shields again unconditionally reappointed Omachonu in April of 2012 for the 2013-2014 academic year.

III. **Denial of Tenure and Subsequent Termination of Employment**

In January of 2013, the tenured faculty of the School of Education and Director Karen Stinson recommended unanimously that Omachonu receive tenure and voted to promote her to associate professor. Despite their recommendation, Dean Elizabeth Throop wrote a letter to Chancellor Dennis Shields in March of 2013 to recommend

---

[3] Bunte allegedly retired fully from the University of Wisconsin-Platteville in July of 2011.

*against* granting Omachonu tenure and a promotion. Dean Throop's recommendation was allegedly based on the "allegations" made by then Director Bunte in 2010 "following [her] selective review of student evaluations." (Am. Compl. (dkt. #12) ¶ 34.) According to plaintiff, basing a tenure recommendation and promotion on student evaluations is "in direct contravention of the criteria for decisions relating to renewal appointments and recommending tenure in Wis. Admin. Code § UWS 3.06(1)(b)," and does not compare to the manner in which tenure recommendations have been made for similarly situated faculty members. (*Id*. at ¶ 35).

Nevertheless, Chancellor Shields informed Omachonu by letter dated April 16, 2013, that he would not recommend her for tenure. Omachonu appealed that decision, but Chancellor Shields reaffirmed his refusal to recommend Omachonu for tenure to the Board of Regents in a letter dated June 19, 2013. At that time, Chancellor Shields also informed Omachonu that her tenure-track appointment would "terminate as of May 2014 and that she would not be retained for the 2014-2015 academic year." (*Id*. at ¶ 39).

Based on the above, Dr. Omachonu alleges that Chancellor Shields, former Director Bunte and Dean Throop all engaged in willful, unlawful discrimination against her on the basis of race and national origin, causing her substantial harm. Specifically, Omachonu alleges that as a direct and proximate cause of the defendants' actions, she suffered lost wages, lost benefits, physical and emotional distress, loss of reputation, injury to career, and loss of future earning capacity.

OPINION

**I.   § 1981 Claims**

Defendants first move to dismiss Omachonu's § 1981 racial discrimination claims. Section 1981 grants equal rights under the law to all and forbids race discrimination, stating that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . and . . . the full and equal benefit of all laws and proceedings . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  Defendants do not maintain that the alleged facts do not implicate plaintiff's rights under § 1981, but rather that § 1983 provides the exclusive remedy for any alleged violations of § 1981 rights by state actors.

As defendants point out, the Supreme Court addressed this issue in the damages context in *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989).  In *Jett*, a school fired a white football coach due to conflicts over policies in combination with the composition of the school changing from predominantly white to predominantly black. *Jett*, 491 U.S. at 705-06.  The coach claimed that the school fired him because of his race, contending that the school wanted to replace him with a black coach.  *Id.* at 706.  Among other claims, he sought to hold the school district liable under § 1981 based on a theory of *respondeat superior*.  The Fifth Circuit Court of Appeals rejected that theory, holding that *respondeat superior* was not a viable theory of liability with respect to § 1981 claims against local governmental bodies.  *Id.* at 712.

The Supreme Court affirmed the Fifth Circuit's holding after a thorough analysis of the surrounding legislative history.  The Court concluded that although it had previously found an implied damages remedy existed in § 1 of the Civil Rights Act of

6

1866 to effectuate § 1981's guarantee of rights in the context of *private* actors, it had no power to do so in the context of *state* actors, because "Congress has established its own remedial scheme" in § 1983. *Id.* at 731. Accordingly, the Court held that "Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in § 1981." *Id.* Thus, because § 1983 does not allow for a theory of *respondeat superior*, Jett had to "show that the violation of his 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* [*v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658 (1978)] and subsequent cases." *Jett*, 491 U.S. at 735-36.

While *Jett* dealt specifically with damages actions, the Seventh Circuit found that § 1981 does not create a private right of action against state actors generally in *Campbell v. Forest Preserve District of Cook County, Illinois*, 752 F.3d 665 (7th Cir. 2014). In *Campbell*, the Forest Preserve District of Cook County, a state actor, fired the plaintiff. *Campbell*, 752 F.3d at 666. Campbell claimed that he was fired because of his race in violation of both § 1981 and § 1983. *Id.* Apparently conceding that the statute of limitations in Illinois barred his § 1983 claims, Campbell sought leave to maintain a claim under § 1981, believing these claims to be timely. *Id.* at 666-67. The court rejected his attempts, holding that § 1981 "does not create a private right of action against state actors." *Id.* at 671. As a result, Campbell's complaint "fail[ed] to state a claim upon which relief can be granted." *Id.* In so holding, the Seventh Circuit also explicitly reaffirmed that § 1983 provides the exclusive remedy for a state actor's violations of § 1981. *Id.; accord Ball v. City of Indianapolis*, 760 F.3d 636 (7th Cir. 2014)

7

(holding that § 1983 is the sole avenue of relief against a state actor); *McCormick v. Miami Univ.*, 693 F.3d 654 (6th Cir. 2012) (stating that under *Jett*, § 1981 cannot be used to sue a state actor in his or her official or individual capacity); *Pittman v. Or., Emp't Dep't*, 509 F.3d 1065, 1071-72 (9th Cir. 2007) (stating that although the Eleventh Amendment does not bar prospective injunctive relief, the holding in *Jett* bars any cause of action against state actors under § 1981). Moreover, the court in *Campbell* did not distinguish between damages and injunctive relief; its holding appears to foreclose *all* federal remedies under § 1981. *See Campbell*, 752 F.3d at 671; *see also Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 467 (7th Cir. 2014) (noting that "the prohibitions in 42 U.S.C. § 1981 are enforced against state actors by suits under section 1983, because section 1981 does not provide remedies against state actors for violation of its prohibitions"); *De v. City of Chi.*, 912 F. Supp. 2d 709, 725 (N.D. Ill. 2012) ("The Seventh Circuit has interpreted *Jett* to stand for the proposition that § 1983 is the exclusive means of enforcing the rights secured by § 1981 against state actors, and that § 1983 is the exclusive means of bringing suit under § 1981.").

While a finding that § 1981 does not extend a private right of action against state actors says nothing about the viability of plaintiff's discrimination claims under § 1983, the holdings in *Campbell* and *Jett* do mean that she cannot maintain a *separate* § 1981 claim against the defendants here. While § 1981 creates rights, § 1983 provides the remedy for violation of those rights. *See McGovern v. City of Philadelphia*, 554 F.3d 114, 116 (3d Cir. 2009) (quoting *Chelentis v. Luckenbach S.S. Co.*, 247 U.S. 372, 384 (1918)) (noting that a "right is a well[-]founded or acknowledged claim; a remedy is the means

employed to enforce a right or redress an injury"); *De*, 912 F. Supp. 2d at 726; *Sledge v. Dist. of Columbia*, 869 F. Supp. 2d 140, 143-45 (D.D.C. 2012). Even after the 1991 amendments, Congress neither explicitly created a § 1981 remedy nor expressed an intent to overrule *Jett*. *Sledge*, 869 F. Supp. 2d at 144-45. Thus, while § 1981 creates rights, it did not create a remedy, except against private actors. *See Campbell*, 752 F.3d at 670-71. Thus, § 1983 remains the only vehicle for enforcement for violations of § 1981 by state actors. *Id.*

In her reply, Omachonu acknowledges that monetary damages against government officials sued in their official capacities are only available under § 1983 (Pl.'s Reply (dkt. #19) 3), but she nevertheless argues that she may still seek *injunctive* relief from state officers under § 1981, since the Eleventh Amendment does not bar such suits. In support, plaintiff points to *Agrawal v. Montemagno*, 574 F. App'x 570 (6th Cir. 2014), which permitted a § 1981 claim for injunctive relief to go forward because the defendants were named in their official capacities and the Eleventh Amendment does not bar such suits. *Id*. at 578. As does this court above, *Agrawal* cites *McCormick*, in which the Sixth Circuit found that the Eleventh Amendment does not preclude suits against individual officials sued in their official capacity for "prospective injunctive relief." *McCormick*, 693 F.3d at 661-62; s*ee also Ex parte Young*, 209 U.S. 123 (1908) (finding that prospective equitable relief is available against state officials when they engage in violations of federal law); *Elliot v. Hinds*, 786 F.2d 298, 301-02 (7th Cir. 1986) (stating that prospective relief falls outside of the prohibitions of the Eleventh Amendment). Contrary to plaintiff's suggestion, however, *McCormick* also: (1) concluded that "*Jett* bars a § 1981 claim against

an individual state actor sued in his or her individual capacity" *and* (2) reaffirmed that "a plaintiff cannot use § 1981 to sue a state actor in his or her official capacity." *McCormick*, 693 F.3d at 660-61. In contrast, *Agrawal* does not address this question at all. In the end, while the *Agrawal* court relies on *McCormick*'s reasoning about the Eleventh Amendment preclusion of suits against individual officials for injunctive relief, a straightforward proposition, it does not speak to the lack of *any* remedy under § 1981 for suits against individual state officials.

That question was resolved by *Jett* and *Campbell*, at least for purposes of this court, which is bound by both decisions. As a result, while the Eleventh Amendment does not bar the plaintiff's separate § 1981 claims, *Jett* and the subsequent Seventh Circuit decisions interpreting *Jett* do. Therefore, the exclusive remedy for Omachonu's claims of discrimination is § 1983, and all *independent* § 1981 claims will be dismissed for failure to state a claim upon which relief can be granted.

## II. Defendant Bunte

Defendants also move to dismiss the claims against Alison Bunte altogether, arguing that: (1) Bunte was not personally involved in the denial of tenure or termination; and (2) Bunte is entitled to qualified immunity. The court will address each argument in turn.

### A. Bunte's Personal Involvement and "Cat's Paw" Theory of Liability

Any damages suit under § 1983 "requires that a defendant be personally involved in the alleged constitutional deprivation." *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014). Given that Bunte had been gone for some three years when Dean Throop recommended against granting Omachonu tenure and Chancellor Shields accordingly refused to recommend her, plaintiff does not claim that Bunte herself took those adverse employment actions against her. Rather, plaintiff's theory is that Bunte, despite her long absence, was still personally involved in the adverse actions she identifies under the so-called "cat's paw" theory of liability.

Cat's paw liability may be imposed when a plaintiff can show that "an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action" taken by another. *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012) (quoting *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 684 (7th Cir. 2001)). To be liable under this theory, a defendant must act in a way that is (1) motivated by discriminatory animus, (2) "intended . . . to cause an adverse employment action," and (3) the proximate cause of the adverse employment action. *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (emphasis removed).

The proximate cause requirement follows common-law tort principles, asking whether the discriminatory acts by the supervisor were a "causal factor" in the ultimate adverse employment action. *Smith*, 681 F.3d at 900. There must be some proof of a "causal nexus" between the discriminatory act and the adverse employment action. *See Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 605-06 (7th Cir. 2012) (citing *Geier v.*

11

*Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996)). This requirement is satisfied by proof that the actor who ultimately makes the decision about the adverse employment action relied on facts given to him or her by the biased supervisor. *See Staub*, 562 U.S. at 421. In *Johnson v. Koppers, Inc.*, 726 F.3d 910 (7th Cir. 2013), for example, the plaintiff's co-worker allegedly filed a false report claiming that Johnson had called him racial and gender-based slurs, which resulted in the employer, Koppers Inc., suspending her. *Id*. at 913. When Johnson later got into a physical altercation with the co-worker, Koppers terminated her employment. *Id.* at 913-14. Johnson sued under the cat's paw theory, arguing that her co-worker harbored discriminatory animus against her because of her race and gender. *Id.* at 914-15. The Seventh Circuit noted that in order to show proximate cause, Johnson had to show that the co-worker's allegedly false report was the "proximate cause" of her termination. *Id.* at 915. Because she was not terminated directly due to the allegedly false story, but rather due to the intervening altercation, the court concluded that Johnson could not establish the proximate cause to prove her discrimination claim. *Id.*

Keeping these principles in mind, the court turns to the question of whether Omachonu has pled sufficient facts to establish Bunte's personal involvement in the denial of tenure via cat's paw liability, particularly whether her involvement is too remote to be causal. At the motion to dismiss stage, Omachonu need only plead facts that, if true, would establish the three elements of a cat's paw theory of liability with respect to Bunte. Considering all of the alleged facts in plaintiff's amended complaint in the light most favorable to the plaintiff, there is sufficient circumstantial evidence to infer that

Bunte's discriminatory animus may have motivated her action sufficiently to satisfy the first element of the cat's paw theory for pleading purposes. Plaintiff pled that Bunte (1) limited her evaluation to take only negative student reviews into account, (2) overloaded plaintiff with classes, and (3) repeatedly changed plaintiff's teaching schedule, all under circumstances evincing discriminatory animus. (Am. Compl. (dkt. #12) ¶¶ 21-25). Of course, this assumes that plaintiff can ultimately *prove* that all of these actions were, as pled, due to Bunte's animus towards plaintiff's race and national origin.

The second element of a cat's paw theory -- intent to cause an adverse employment action -- is also adequately pled. Bunte's alleged discriminatory acts and negative evaluation of Omachonu in 2010 allow for the reasonable inference of a general intent to harm Omachonu's career, even if Bunte did not specifically intend for her actions to cause the 2013 denial of tenure and subsequent termination of employment. *See Alexander*, 263 F.3d at 684 (quoting *Eiland v. Trinity Hosp.*, 150 F.3d 747, 752 n.1 (7th Cir. 1998)) (stating that summary judgment would be improper if the plaintiff can show that the employee with discriminatory animus provided "factual information or other input that may have affected the adverse employment action").

In order to satisfy the final element of the cat's paw theory of liability, Bunte's negative evaluation and discriminatory acts, as pled, must be sufficiently connected to the harm Omachonu suffered in order to establish proximate cause. *See Johnson*, 726 F.3d at 915; *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 572 (7th Cir. 2012). In the case at hand, at least as pled, the denial of tenure and termination of her employment purportedly flowed directly from Bunte's negative 2010 allegations. Specifically, Dean Throop allegedly

13

based her March 12, 2013, letter recommending against plaintiff's tenure and promotion on Bunte's assertions from 2010. (Am. Compl. (dkt. #12) ¶ 34.)

Quite understandably, Bunte's primary challenge to this element is one of remoteness in time: she contends that her allegedly discriminatory actions in 2010 and the termination and denial of tenure in 2013 are too temporally remote to be a proximate cause. On summary judgment, or perhaps at trial, this three-year gap may well prove a decisive defect in plaintiff's theory, but defendants' emphasis on timing is premature at the notice pleading stage.

As an initial matter, defendants cite no case suggesting that there is any sort of bright-line, "three-year time bar" for proving causation as a matter of law, particularly under a cat's paw theory of liability. Furthermore, the cat's paw doctrine incorporates principles of common law proximate cause; the "key question is whether the non-decision-maker's actions were a 'causal factor' . . . in the termination decision." *Smith*, 681 F.3d at 900. Based on the facts as pled, Bunte's 2010 letter was the primary, if not sole, cause of the 2013 discriminatory actions against plaintiff, which suffices to allege proximate cause. *See Staub*, 562 U.S. at 419 ("Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'") (quoting *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010)).

However unlikely Omachonu's allegations may *ultimately* prove to be, there is nothing in this limited record to permit, much less compel, an inference that other intervening events were the proximate cause of plaintiff's denial of tenure and

14

termination. *Cf. Johnson,* 726 F.3d at 915 (intervening physical altercation between plaintiff and co-worker, not earlier false report, was proximate cause of plaintiff's termination). At the Rule 12(b)(6) stage, the court cannot speculate as to what other facts bearing on causation might be behind the complaint.

Obviously, the substantial gap in time between the actions allegedly intended to cause an adverse employment action and the action itself "might lessen [the] evidentiary punch [of those actions], but the passage of time does not make them inadmissible." *Perez v. Thorntons, Inc.,* 731 F.3d 699, 710 (7th Cir. 2013) (reversing grant of summary judgment for the defendant based in part on "remarks, which were made about a year before [plaintiff's] termination"). On summary judgment, defendants may well be able to introduce evidence that other, intervening events were the proximate cause of Omachonu's tenure denial and termination, or at least that Bunte's alleged actions were not. Without the benefit of that record, however, the court cannot assume that Omachonu will be unable to prove causation based solely on the passage of time. Accordingly, this question is better decided on summary judgment or at trial. *See, e.g., Smith*, 681 F.3d at 899-900 (causation under cat's paw liability theory analyzed at summary judgment); *Howe v. Sears, Roebuck & Co.*, 990 F. Supp. 2d. 913, 926 (W.D. Wis. 2014) (whether plaintiff's protected activity was causally connected to her later termination analyzed on summary judgment); *Bostwick v. Watertown Unified Sch. Dist.*, No. 13-C-1036, 2015 WL 520701, at *7 (E.D. Wis. Feb. 9, 2015) (same).

Because plaintiff alleges facts that permit the court to infer a causal nexus between Bunte's allegedly discriminatory acts and Omachonu's termination -- albeit a nexus

vulnerable to challenge at summary judgment due to the passage of significant time between the two -- she has sufficiently pled the third element of the cat's paw theory of liability to survive a motion to dismiss. The court will, therefore, deny the motion to dismiss for lack of personal involvement.

### B. Qualified Immunity

In the alternative, defendants argue that the court should dismiss Bunte because she is entitled to qualified immunity. Specifically, defendants argue that Bunte's alleged actions do not constitute a clear violation of Dr. Omachanu's constitutional rights. Qualified immunity is an affirmative defense that requires the defendant to show the objective reasonableness of his or her conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982). Its purpose is to shield government officials from liability (and thereby make them comfortable acting in the public interest) when their conduct does not violate a "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. The test is objective and asks whether the government official "knew or reasonably should have known that the action . . . would violate the constitutional rights of the [plaintiff]." *Id.* at 815.

An immunity defense is usually very fact-intensive, generally making dismissal at the pleading stage inappropriate. Indeed, a plaintiff is not "required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity." *Alvarado v. Litscher*, 267 F.3d 648, 651-52 (7th Cir. 2001) (quoting *Jacobs v. City of Chi.*, 215 F.3d 758, 765 n.3 (7th Cir. 2000)). This makes Rule 12(b)(6) "a mismatch for immunity and almost always a bad ground for dismissal." *Id*. at 652 (quoting *Jacobs*, 215

F.3d at 775(Easterbrook, J., concurring)). If the unlawfulness of the government official's conduct as pled is not clearly established, however, then the government official could be entitled to qualified immunity, even if the defense is asserted at the pleading stage. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

In this case, plaintiff's claims are based on a clearly established right to be free from discrimination in employment based on race and national origin. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-79 (1976) (citing Title VII of the Civil Rights Act of 1964). In addition to § 1981 and § 1983, many other federal statutes and cases speak to this right. Assuming Omachonu's allegations to be true, as the court must at this stage, Bunte's conduct in particular would be clearly unlawful. Bunte is alleged to have made statements about Omachonu and made her circumstances more difficult for discriminatory reasons, and the court has concluded it is reasonable to infer she intended negative effects to result from those acts. Because a reasonable state employee would have known that discrimination based on a person's race or national origin violates a right clearly established in the Constitution and several federal statutes, defendant cannot currently satisfy the objective requirement of the immunity defense. At this stage of the proceedings, Omachonu need only "allege -- not prove -- the deprivation of a constitutional right." *Tamayo*, 526 F.3d at 1090.

While it may later become apparent that Bunte's negative evaluation and the assignment of a heavy teaching schedule to Omachonu in 2010 were not motivated by discriminatory animus or intended to cause any kind of long-term, adverse employment action, or that they were not a proximate cause of plaintiff's denial of tenure and

termination some years later, the court must assume the truth of the specific allegations to the contrary in evaluating Omachonu's claims against Bunte at the motion to dismiss stage. Therefore, she will not be dismissed from the suit at this time on qualified immunity grounds.

### III. Leave to Amend

Finally, defendants request that Dr. Omachonu's § 1981 claims be dismissed with prejudice.[4] Dr. Omachonu has not explicitly requested leave to amend her complaint in the event that the court grants the motion to dismiss in whole or in part, but the court nevertheless briefly considers whether dismissal without prejudice may be appropriate at this stage.

Courts should freely grant leave to amend pleadings when justice so requires. Fed. R. Civ. P. 15(a)(2). However, the right to amend is not absolute and "is appropriately denied when . . . the amendment would be futile." *Brunt v. Serv. Emps. Int'l Union*, 284 F.3d 715, 720 (7th Cir. 2002); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). An amendment would be futile if it would not survive a motion to dismiss or if the claims are inadequate. *Brunt*, 284 F.3d at 720-21; *see also Gandhi v. Sitara Capital Mgmt., LLC*, 721 F.3d 865, 868-69 (7th Cir. 2013).

Here, the court concludes that it would be futile for Dr. Omachonu to amend her § 1981 claims, because it is clear as a matter of law that the sole remedy for claims against a state actor for § 1981 violations is § 1983. Since there are no new factual

---

[4] They also request that the court dismiss the claims against Bunte with prejudice, but because the court has not dismissed Bunte from this suit, that request will necessarily be denied.

18

allegations she could add that would change that conclusion, amendment of the § 1981 claims would be futile. Those claims will, therefore, be dismissed with prejudice.

ORDER

IT IS ORDERED that:

1) Defendants' original motion to dismiss (dkt. #9) is DENIED as moot.

2) Defendants' renewed motion to dismiss (dkt. #18) is GRANTED IN PART AND DENIED IN PART as set forth above.

3) Plaintiff's § 1981 claims are hereby DISMISSED with prejudice.

Entered this 24th day of July, 2015.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge