IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

FLORENCE E. OMACHONU,

                        Plaintiff,                  OPINION AND ORDER

    v.
                                                          15-cv-069-wmc

DENNIS J. SHIELDS, ELIZABETH A.
THROOP and ALISON B. BUNTE,

                        Defendants.

Defendants Dennis J. Shields, Elizabeth A. Throop, and Alison B. Bunte[1] participated in decisions to deny tenure and terminate the employment of plaintiff Florence E. Omachonu, then a tenure track professor at the University of Wisconsin-Platteville. As an African American woman born in Nigeria, Omachonu claims defendants' actions denied her equal protection rights in violation of 42 U.S.C. § 1983. Before the court is defendants' motion for summary judgment (dkt. #27), which will be granted for the reasons set forth below.

---

[1] The court granted the parties' stipulation to toll the deadline to substitute defendant Bunte, who passed away in the summer of 2015, for her personal representative until after the court's ruling on defendant's motion for summary judgment. (Dkt. #48.) Because the parties treat defendant Alison Bunte as the proper defendant for summary judgment purposes, so will the court.

**A. Background**

Plaintiff Florence E. Omachonu was born and educated in Nigeria, including Evwreni Teachers College, where she earned a diploma in elementary education in 1979. After leaving Nigeria, Omachonu earned a B.A., *magna cum laude*, in early childhood education at the University of District Columbia in 1985 and a M.Ed. in education administration and supervision at George Washington University in 1989. Between 1994 and 2012, Dr. Omachonu pursued her doctoral studies at Florida A&M University, Widener University and Edgewood College, where she received an Ed.D. in educational leadership.

Dr. Omachonu began teaching early childhood students in Nigeria. As an assistant professor at Georgia College & State University, Fort Valley State University and Middle Tennessee State University between 1997 and 2006, she taught a number of courses in subjects including secondary education and corrective reading in elementary education.[3]

In 2007, Dr. Omachonu interviewed for a tenure track faculty position at the University of Wisconsin-Platteville ("UW-Platteville" or "UWP"). This interview included an evaluation by faculty from UWP's School of Education, who observed her teach a class, field questions from students and lead a discussion about "content area

---

[2] Viewing the facts in the light most favorable to plaintiff as the non-moving party, the following facts are material and undisputed for purposes of summary judgment, except as noted below.

[3] Although not directly relevant, Dr. Omachonu contends that during this later period, her students rated her highly, and none of her supervisors questioned her effectiveness as a teacher.

literacy." Having apparently met or exceeded expectations, Dr. Omachonu was hired in mid-December of 2007 as a tenure track professor in the School of Education ("Education" or "SOE"). She began teaching at UWP in the spring of 2008, and her first semester teaching a full course load was in the fall of that year.

### B. Dr. Omachonu's Relationship with Dr. Bunte

Defendant Alison B. Bunte, a Caucasian woman, was SOE's Director during the 2008-2009 and 2009-2010 academic years. She stepped down as Director on June 30, 2010, serving in a different capacity at UW-Platteville during the 2010-2011 school year, and retiring fully from the university on June 30, 2011.

Before Omachonu began teaching her first semester at UWP in the spring of 2008, Bunte sent Omachonu an email assigning her to serve as the coordinator of the graduate reading program. However, Bunte neglected to inform Dr. Greg Imbur, who was the coordinator at the time and also Caucasian, of that decision. As a result, Imbur only became aware of Omachonu's assignment when he called her on the phone to welcome her and ask whether she had received an assignment from SOE. To avoid any potential friction, Omachonu offered to concede the position to Imbur, but the then-Director of the SOE, Michael Anderson, proposed that Imbur and Omachonu serve as co-coordinators.

Thereafter, Imbur and Omachonu had a collegial relationship as co-coordinators until Imbur's departure from UW-Platteville in the summer of 2009. At that time, however, rather than continue Omachonu in her position as coordinator of the graduate reading program, Bunte removed Omachonu and assigned herself to the position. Bunte

informed Omachonu in an email that she could not be the sole coordinator without first obtaining a "terminal degree." Bunte further explained that the co-coordinator arrangement was "fine because Greg had the terminal degree." (Decl. of Anne M. Bensky, Ex. FF (dkt. #34-11).)

Among other things, the parties dispute whether having a terminal degree was a prerequisite for the coordinator position or only a preferred qualification. Regardless, Omachonu attributes pretext to defendant Bunte's explanation, asserting that she removed Omachonu from the coordinator position in response to her pointing out "deficiencies in the curriculum of the reading program and the absence of Dr. Bunte's own syllabi." (Decl. of Dr. Florence E. Omachonu (dkt. #44) ¶ 65.) Omachonu further claims that despite stripping her title, Bunte expected her to maintain the same responsibilities she had as a co-coordinator. Also in the summer of 2009, Omachonu raised a concern with Bunte's decision to grant a waiver to one of Bunte's graduate advisees, who did not meet a requirement set forth by the Wisconsin Department of Public Instruction. Omachonu claims that Bunte "took umbrage" with Omachonu questioning her decisions in a manner unlike she had with any Caucasian faculty members who had challenged her in the past, but Omachonu provides no specifics about any other times when a Caucasian "challenged" Bunte.[4]

The parties agree that Bunte adjusted Omachonu's teaching assignments for the 2009-2010 school year, which included assigning her a class comprised of two courses

---

[4] Similarly, Omachonu fails to provide specifics to support her assertion that "Bunte praised Caucasian staff for . . . minor matters" at faculty meetings but never showed Omachonu any comparable appreciation for more substantial work. (Pl.'s Add'l PFOF (dkt. #43) ¶ 318.)

that had been combined. This resulted in Omachonu again "challenging" Bunte's authority as a result of her objection to being assigned the combined course. Specifically, Omachonu told Bunte that there were too many students for her to teach effectively. Bunte responded with a memo explaining her reasons for denying Omachonu's request not to teach that class. Omachonu also complained about the assignment to Mittie Nimocks Den Herder, then UWP's Dean of the College of Liberal Arts and Education, who emailed Omachonu explaining that she agreed with Bunte's course assignments. There is no dispute that UW-Platteville was experiencing budget issues, which required SOE to reduce costs for the 2009-2010 school year, but Omachonu asserts that Bunte made no similar change to the course assignments of Caucasian faculty. Again, however, she fails to identify any factual support in the record for her assertion that Bunte made no similar change to "teaching assignment[s] at the last minute, without notice" with respect to "native born Caucasian faculty in the department." (Pl.'s Opp'n Br. (dkt. #46) at 7.)

## C. Negative Student Evaluations

On December 21, 2009, Bunte convened a meeting with Omachonu and then Dean Den Herder, as well as Omachonu's union representative and a human resources representative, to discuss Omachonu's negative student evaluations.[5] On December 29,

---

[5] The mechanics of student evaluations are not a matter of material dispute. In a nutshell, students fill out student evaluation forms for all Education faculty members at the end of every semester. The form includes a multiple choice section in which students can indicate how strongly they agree with five different statements concerning the instructor's performance, along with a section in which students can provide handwritten comments. The handwritten comments are later typed by School of Education support staff. These scores and comments are then

2009, Omachonu wrote a letter to Bunte responding to concerns raised during the December 21 meeting. In her letter, Omachonu accused Bunte of encouraging students to give her negative evaluations and of "vindictively seek[ing] incriminating information" about her. (Bensky Decl., Ex. AA (dkt. #34-6).) Omachonu believed that this behavior was part of Bunte's continuing "efforts to get even," dating back to Omachonu telling Bunte that she "had lowered the integrity of the graduate reading program." (*Id.*) Omachonu's letter also expressed her belief that the negative student evaluations were largely because those students were not prepared for her high academic expectations, and not because of any shortcomings in Omachonu's teaching ability.

Bunte responded with a memo of her own on January 11, 2010, identifying four specific areas of concern raised in Omachonu's student evaluations and listing four suggestions for improving the clarity of her assignments. (Bensky Decl., Ex. DD (dkt. #34-9).) In addition, Bunte informed Omachonu that she was adjusting her course schedule for the spring of 2010 semester, since Bunte felt that "perhaps the number of students was a contributing factor in [Omachonu's] low evaluation scores." (*Id.*)

### D. Retention Reviews

The School Review Board committee ("Review Board" or "SRB"), which consists of Education faculty members, is charged with making salary, retention and tenure recommendations. Once every year, faculty members are expected to submit files to the Review Board demonstrating three things: (1) teaching effectiveness; (2) scholarly activities; and (3) community service. The files also typically include a narrative report

compiled and included in a binder for each faculty member's annual review.

prepared by the faculty member, compiled student evaluations, course syllabi, and sample assignments. Board members then use a protocol to evaluate each faculty member in each of three areas of assessment. Afterward, the Review Board meets collectively to score a Teaching Evaluation Report. The Board considers teaching effectiveness the most important of the three criteria. The completed Teaching Evaluation Report is then placed in each faculty member's file, and each faculty member can appeal the Board's evaluation.

The Board's recommendation as to tenure is made to the College of Liberal Arts and Education's Retention, Salary and Tenure Committee (for purposes of this opinion, referred to as "the Retention & Tenure Committee," "Committee" or "R&TC"), which is an elected committee headed *ex officio* by the associate dean of the College of Liberal Arts and Education. That Committee then makes a tenure recommendation to the chancellor.

With respect to the 2011-2012 school year, the Review Board recommended that the Committee retain Omachonu, as well as give her a merit increase in salary. On February 19, 2010, however, the Retention & Tenure Committee issued a memorandum indicating its disagreement with the Board's recommendation and noting "no evidence of progress toward the completion of the doctorate" nor "an acceptable level of scholarly activity and professional development beyond the campus community." (Decl. of Mittie Nimocks Den Herder, Ex. Q (dkt. #31-7).)

Around the same time, in a memo dated February 24, 2010, Omachonu purported to respond to a letter dated January 26, 2010, the latter apparently written by the Board, or at least certain tenured, Education faculty. In the memo, Omachonu sought to correct

"misstatements and factual errors" regarding her progress toward her doctorate, her familiarity with the applicable educational standards and missed SOE commitments. (Bensky Decl., Ex. HH (dkt. #34-13).) Omachonu also purported to address "concerns that were brought to [her] attention" about her student evaluations. (*Id.*)

On March 5, 2010, Omachonu also appealed the Retention & Tenure Committee's recommendation against her retention. A week later, on March 12, 2010, the Committee wrote a memo to Omachonu reversing its recommendation, but still directing her to address the "many concerns expressed by the tenured faculty in the School of Education." (Decl. of Mittie Nimocks Dan Herder, Ex. Q (dkt. #31-7).) Also on March 12, 2010, Dean Den Herder wrote a memo to Duane Merlin Ford, the then Provost and Vice Chancellor, stating that she reluctantly concurred with the Committee's recommendation to retain Omachonu. (Dan Herder Decl., Ex. R (dkt. #31-8).)

Bunte apparently also intended to write a letter recommending against retaining Omachonu, but she mistakenly waited until after the Board and Committee had already made their recommendations. Bunte expressed her disappointment in missing this opportunity in an email sent to Dean Den Herder on March 18, 2010, stating "I believe that we have given [Omachonu] many [opportunities] to change[,] and I believe that she will not change." (Decl. of Timothy E. Hawks, Ex. 20 (dkt. #45-20).)

### E.  Overcoming More Negative Student Evaluations

On June 9, 2010, Bunte wrote Omachonu a memo regarding her student evaluations for the spring 2010 semester. Bunte also copied Dean Den Herder on the memo. In full, it stated:

Attached are your student evaluations for spring 2010. Please read over them. I would like you to notice the parts that I have highlighted. Most of the highlighted areas have to do with the clarity of instruction and confusion with assignments.

These same two areas were of concern [i]n December when you and I met with Kate Kelly and Nancy Turner. We suggested that you explain assignments well in advance of the due date and to make sure the instructions were clear and that the students understood. We also suggested the use of rubrics for each assignment. It appears that these problems still exist.

I hope that you will continue to work on these issues. The Teaching and Learning Center, formerly the TEC, may have some suggestions for you to try.

The overall average of your evaluation scores is a 2.80. The faculty average for faculty this semester was a 4.56. All of averages ranged from 4.41 and 4.92. You need to work to pull up your average scores if you plan to seek retention, tenure, or promotion.

Please let me know if I can help in any way.

(Bensky Decl., Ex. W (dkt. #34-2).)

Omachonu responded to Bunte in a letter dated June 25, 2010. In it, Omachonu accused Bunte of disparaging her character and selectively emphasizing "the negatives while deliberately ignoring the positives." (Bensky Decl., Ex. GG (dkt. #34-12).) Omachonu also attributed her negative evaluations to an unwillingness to compromise the high academic standards that Omachonu demanded in the classroom. Furthermore, with respect to some of the negative student evaluations, as well as Bunte's reliance on them, Omachonu pointed to what she perceived to be a discriminatory animus:

Typically, when a department wants to get rid of a foreign instructor who is intellectually challenging, as is true in my

9

case, it is student evaluations that are relied on to make such judgments. And students when they are not doing well and don't want to work hard will usually cite the instructor's race and ethnicity ("accent") as an excuse. This is a common experience for foreign-born instructors and the academy is checkered with such practices.

(*Id.*)

Despite receiving negative evaluations, Bunte, as chair of the Review & Tenure Committee, notified Omachonu that the committee had recommended her for reappointment for the 2012-2013 academic year on February 23, 2011. Moreover, Den Herder, by then having been elevated to become UWP's Provost, notified Omachonu that she had agreed with the Committee's recommendation for retention in a memorandum dated April 11, 2011. Unlike in the spring of 2010 when Den Herder was still Dean of the College of Liberal Arts and Education, her memorandum as Provost did not mention that Omachonu needed to address concerns regarding teaching effectiveness.

Relying on Provost Den Herder's recommendation, Dennis J. Shields, UW-Platteville's Chancellor, reappointed Omachonu for the 2012-2013 academic year in a letter dated April 21, 2011. The Review Board, Review & Tenure Committee and Den Herder all recommended Omachonu again in February and March of 2012, and Chancellor Shields reappointed her for the 2013-2014 academic year as well. None of the recommendations and reappointments of Omachonu for the 2012-2013 and 2013-2014 academic years noted any concerns regarding her teaching. Indeed, Omachonu's peer evaluations in January of 2012, the last time she received them, were "above normal" in the category of teaching effectiveness (as defined on the five-point scale for peer and student evaluations consisting of: low, below normal, normal, above normal and

outstanding). Likewise, her student evaluations in December of 2012, also the last time she received them, were "above normal."

### F. Tenure Review

Defendant Elizabeth Throop replaced Den Herder as the Dean of the College of Liberal Arts and Education in June of 2012. During the relevant period leading up to Omachonu's bid for tenure for the 2013-2014 academic year, Dean Throop reported to Provost Den Herder, who reported to Chancellor Shields. Although Throop has no authority to make tenure decisions, nor to overturn the recommendation of the Review & Tenure Committee, she does make an independent recommendation to the Chancellor as to tenure for each faculty member separate from the faculty governance process. Provost Den Herder also reviews the Committee's tenure file and recommendations before making her own independent recommendation.

On January 30, 2012, tenured faculty members of the School of Education wrote to Omachonu, asking her to affirm her progress toward tenure and notifying her that she needed to "complete [her] doctorate before [her] tenure year (January 2013)." (Hawks Decl., Ex. 10 (dkt. #45-10).) In or around January of 2013, Colleen McCabe, the chair of the Review Board in 2013, received Omachonu's tenure file, which the Board then discussed. In a cover letter written to Omachonu on January 16, 2013, the Board indicated that her assessment for teaching was "recorded as normal," but that her student evaluations were far below SOE averages, causing the Board to have "serious concerns" about Omachonu's teaching effectiveness. (Decl. of Colleen A. McCabe, Ex. E (dkt. #30-1).) On that same day, the Review Board forwarded a short memo to the Review &

Tenure Committee indicating those "serious concerns" about Omachonu's teaching effectiveness. (*Id.*, Ex. F (dkt. #30-2).)

Omachonu also wrote a letter to the Review Board, dated January 18, 2013, appealing its assessment of her teaching and requesting a meeting. In response, the Board held an appeals meeting at which Omachonu submitted additional materials. As a result of this meeting and the submission of additional materials, the Board changed its peer evaluation assessment of Omachonu's teaching from normal to above normal; it also withdrew the comment about its serious concerns with her teaching effectiveness. These changes were memorialized in a memo to the Review & Tenure Committee, and the Board ultimately recommended Omachonu for tenure in another memo, dated January 30, 2013. Additionally, as part of a process separate from the Review Board, the tenured faculty of the School of Education voted unanimously to recommend tenure for Omachonu, which they recorded in a memo dated January 22, 2013.

In addition to the Review & Tenure Committee, Education Dean Throop also reviewed Omachonu's original file. Dean Throop then prepared a memo, dated March 12, 2013, which recommended to Chancellor Shields that Omachonu *not* be offered tenure. In her memo, Throop explained that "[a] review of the materials [Omachonu] has submitted, as well as additional information from student evaluations, reveal a continual, documented pattern of poor performance in the classroom," even after "she [was] explicitly advised that her teaching performance is not adequate." (Decl. of Elizabeth A. Throop, Ex. D (dkt. #29-1).) Bunte had retired from UW-Platteville before Throop even began serving as Dean of the College of Liberal Arts and Education and well

before she recommended against tenure for Omachonu. As a result, there is no dispute that Throop did *not* have any conversation with Bunte about Omachonu, although among the materials that Dean Throop considered was Bunte's memo from June 9, 2010, and the remainder of Bunte's file.[6]

In her new position as Provost, Den Herder also made a recommendation as to tenure for Omachonu. There is some dispute about which materials Dan Herder reviewed in reaching that decision, but she swears in her declaration in support of summary judgment that she recommended against tenure primarily because of a lack of any evidence in Omachonu's tenure file that she had made satisfactory efforts to improve her teaching or to respond more appropriately to constructive criticism. (Den Herder Decl., (dkt. #31) ¶ 5.) Plaintiff, on the other hand, would infer from Den Herder's inability to recall specific materials in the file at her deposition more than two years later that she was never familiar with the content of Omachonu's file.

After UWP Provost Den Herder and Education Dean Throop informed Chancellor Shields about their recommendations against tenure, Shields convened a meeting with the tenured Education faculty to discuss the Review Board's decision to change its assessment of Omachonu's teaching effectiveness in January of 2013, after she appealed its initial expression of "serious concern."[7] The parties dispute somewhat the strength of support for Omachonu expressed by tenured faculty members at that meeting

---

[6] As for specific materials that she had reviewed, Throop's memo also referenced then Dean Den Herder's memo from March 12, 2010, as well as negative teaching evaluations after June of 2010. (Throop Decl., Ex. D (dkt. #29-1).)

[7] The parties do not pin down the exact date of this meeting, but there appears to be no dispute that it took place *before* Chancellor Shields made his initial decision denying tenure.

although even plaintiff concedes that the support for her tenure may not have been overwhelming.

Then, on or around April 6, 2013, Provost Den Herder invited Omachonu to submit materials to the Chancellor contesting her recommendation against tenure, which Omachonu did in the form of a letter. In her letter, Omachonu again criticized former Education Dean Bunte for attempting to undermine her after she critiqued his leadership in the graduate reading program. (Den Herder Decl., Ex. K (dkt. #31-1).) In that same letter, Omachonu also criticized Provost Den Herder for siding with Bunte as her "longtime friend and mentee," as well as then Education Dean Throop for crediting Bunte's assessments without personally evaluating her performance as a teacher. (*Id.*)

Chancellor Shields reviewed Omachonu's tenure file, although again plaintiff questions the thoroughness of his review by stressing his inability to recall specifically at his deposition whether any syllabi were included in her file. According to Chancellor Shields, he was again unable to identify anything in Omachonu's tenure file suggesting that she made an effort to address the concerns raised by students and identified by supervisors, a conclusion which plaintiff, of course, disputes.

On April 16, 2013, Shields informed Omachonu by letter that he was denying her tenure:

> Beginning in 2009 questions were raised about your teaching, in large part stemming from student reviews that were, and remain, well below the norm of tenured faculty within the School of Education. Further, notwithstanding several admonishments from the Dean of your college [Den Herder] and the Director of the School of Education [Bunte], nowhere in your portfolio do you address these concerns. No actions were taken, and no explanations were offered. As a

14

> teaching institution, it is simply unacceptable for a professor to dismiss feedback from students. It is imperative that the faculty be able to successfully deliver course content and material in a way that positively and productively delivers an educational benefit to our students.

(Den Herder Decl., Ex. L (dkt. #31-2).) Omachonu appealed Shields' decision.

## G. Final Appeals

In May of 2013, Chancellor Shields met with Omachonu for about an hour to address her appeal. During that meeting, Omachonu presented information about her teaching strategies, as well as an audio clip of her interacting with students in the classroom. Omachonu perceived Shields to be attentive during their meeting. After the meeting, she also followed-up with a letter dated May 9, 2013, which included several examples of positive student evaluations. Nevertheless, on June 19, 2013, Shields wrote a letter to Omachonu informing her of his final decision to deny her tenure. The parties agree that like Dean Throop, Shields never spoke to Bunte about Omachonu.

Omachonu then appealed Shields' final decision. An ad hoc committee was convened to hear her appeal at UW-Platteville. The committee consisted of five members and two alternates. Both Shields and Omachonu were permitted to replace one member with an alternate. At the hearing that followed, Omachonu testified on her own behalf, but the committee ultimately determined that she had failed to demonstrate that the decision to deny tenure lacked a rational foundation. Based on the committee's finding, Chancellor Shields upheld his final decision to deny Omachonu tenure.

OPINION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In deciding a motion for summary judgment, the court must view all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Sarver v. Experian Info Sols.*, 390 F.3d 969, 970 (7th Cir. 2004) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

Until recently in this circuit, either the direct or indirect methods of proof applied to claims of intentional discrimination in violation of the equal protection clause. Under the former, direct evidence "would prove discriminatory intent without reliance on inference or presumption," *Harper v. Fulton County, Illinois*, 748 F.3d 761, 765 (7th Cir. 2014), or circumstantial evidence, including suspicious timing and evidence that similarly-situated individuals received systematically better treatment, would create a "convincing mosaic" of discrimination. *Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 691 (7th Cir. 2014). In contrast, the burden-shifting framework of the indirect method only required a plaintiff to establish a prima facie case by showing an adverse employment action, carrying out of legitimate business expectations and less favorable treatment than a similarly-situated individual, and then the burden shifted to the employer to offer a

nondiscriminatory reason for the employment action, which the plaintiff could rebut by showing the employer's asserted explanation was pretextual. *See Harper*, 748 F.3d at 767.

In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit clarified, however, that evidence need not be evaluated as "direct" or "indirect," but "must be considered as a whole." *Id.* at 765. Ultimately, the standard is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* Here, plaintiff claims that defendant Bunte intentionally discriminated against her because of her race and national origin, both in violation of her equal protection rights under 42 U.S.C. § 1983.[8] Plaintiff further claims that those same discriminatory actions on Bunte's part provided the causal link for defendant Dean Throop's recommendation against tenure and ultimately defendant Chancellor Shields' final decision to deny tenure. The court addresses plaintiff's claims against each defendant in turn.

## I. Defendant Bunte

Plaintiff places defendant Bunte at the center of her discrimination claims, asserting that she set in motion contrivances eventually resulting in her denial of tenure. According to plaintiff, the catalyst for Bunte's unfair treatment was her challenge to Bunte's leadership of the graduate reading program. In particular, Omachonu identifies

---

[8] Defendants insist that the court dismissed plaintiff's race discrimination claim when it granted their motion to dismiss her § 1981 claim. Since the parties nevertheless address both race and national origin discrimination, and there is no appreciable difference between the two under the facts of this case, the court effectively addresses both claims for purposes of deciding the summary judgment motion.

two critiques that motivated Bunte to act on her alleged discriminatory animus: (1) Omachonu's disagreement with Bunte's decision to grant a waiver to a student who did not meet state education standards; and (2) Omachonu's identification of deficiencies in the reading program's course offerings, including that Bunte had neglected to submit syllabi for the courses that she was teaching.  (Pl.'s Opp'n Br. (dkt. #46) at 6, 8.)

As a result of these episodes, plaintiff contends, Bunte took several actions to undermine her employment at UWP, including:  (1) removing Omachonu from her position as coordinator of the graduate reading program, despite her superior qualifications; and (2) assigning her a combined course with more students than could be taught adequately.[9]  Even worse, Omachonu suspects Bunte met with her students in private and encouraged them to provide negative evaluations, although the only apparent "evidence" for this suspicion are that "student complaints reflected Dr. Bunte's own language" (*Id.* at 8), and Bunte presented a critical "petition" purportedly prepared, but not signed, by Omachonu's students.  (Pl.'s Add'l PFOF (dkt. #43) ¶ 218.)  There is no dispute that at least by March of 2010, Bunte believed that Omachonu should not be retained as UWP faculty, as expressed in an email she sent to then Education Dean Den Herder lamenting her having missed the opportunity to write a letter to that effect.

Of course, none of this would support a finding that Bunte took these actions for reasons of discriminatory animus based on plaintiff's race or country of origin.  For that, plaintiff asserts generally that:

---

[9] Plaintiff does not appear to argue that these actions are independently actionable under § 1983. Regardless, the court agrees with defendants that they would not suffice as adverse employment actions.  (*See* Defs.' Opening Br. (dkt. #36) at 20-22.)

- "Dr. Bunte did not [make last-minute changes to teaching assignments] with the native born Caucasian faculty in the department" (Pl.'s Opp'n Br. (dkt. #46) at 7);

- "Dr. Bunte took umbrage with Dr. Omachonu's challenge [regarding her waiver for a graduate advisee] in a manner that she did not demonstrate when challenged by Caucasian faculty" (*Id.* at 8);

- "Dr. Bunte introduced bias into the evaluation process and used student evaluations against Dr. Omachonu, and not against Caucasian faculty" (*Id.* at 23);

- "Dr. Bunte did not verbally harass or ridicule any other faculty members who were overwhelmingly Caucasian" (*Id.* at 25); and

- "Dr. Bunte belittled Dr. Omachonu's ideas for improving students' learning, but she did not belittle the ideas proposed by any other faculty members, who were overwhelmingly Caucasian" (*Id.* at 28).

Such general, non-specific assertions of Bunte's discriminatory animus fall short of evidence typically required to prove a discrimination claim. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) (explaining that uncorroborated, self-serving testimony "based on personal knowledge or firsthand experience" can create a dispute of fact, but not "mere conclusory allegations"); *Oest v. Ill. Dept. of Corr.*, 240 F.3d 605, 615 (7th Cir. 2001), *overruled on other grounds by Ortiz*, 834 F.3d at 765 (plaintiff's "own conclusory assertions, and not specific evidence, that any male officer had committed conduct similar to hers or that any similarly situated officer was treated more

favorably" were "uncorroborated generalities . . . insufficient to support a Title VII claim"); *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998) (plaintiff's "conclusory statements" regarding discriminatory testing conditions were not enough to survive summary judgment); *Wilborn v. Kraft Foods Grp., Inc.*, 71 F. Supp. 3d 927, 934-35 (W.D. Wis. 2014) ("Schwenn's declaration . . . simply takes the adverse actions that befell Wilborn and asserts that unnamed white employees in the same circumstances did not suffer the same fate. Without factual elaboration, Schwenn's statements about the white comparators amount to nothing more than mere conclusions, inadequate to create a genuine dispute of fact."). Indeed, the only specific evidence of Bunte's motivation for seeing that Omachonu was denied tenure was, as defendants point out, was that Bunte resented her "challenges" to her leadership of the graduate reading program, which even if true, does not amount to discrimination animus based on race or country of origin.

Regardless, given that the only actionable adverse employment action that Omachonu encountered is the decision to deny her tenure, which was made nearly *two years* after Bunte retired from UWP and was a decision in which she was not personally involved, Bunte could only be held liable under a "cat's paw" theory. *See Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.") (citation omitted). For employment discrimination claims, the cat's paw theory of liability requires the plaintiff to "show that an employee with discriminatory

animus provided factual information or other input that may have affected the adverse employment action." *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012), *overruled on other grounds by Ortiz*, 834 F.3d at 765 (quoting *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 684 (7th Cir. 2001)); *see also id.* at 898-99 (indicating likely agreement with "at least five circuits . . . that a cat's paw theory would support imposing *individual* liability under § 1983 on subordinate governmental employees with unlawful motives who cause the real decision-makers to retaliate") (emphasis in original).

To prevail under this theory, plaintiff must prove that Bunte's discriminatory animus proximately caused Chancellor Shields' ultimate decision to deny tenure. *See Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 928 (7th Cir. 2017). Even if plaintiff could establish a causal link, however, "the chain of causation can be broken if the unbiased decision-maker conducts a meaningful and independent investigation of the information being supplied by the biased employee." *Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015). As discussed in further detail below, even if a reasonable jury could find that defendant Bunte harbored actionable, discriminatory animus toward Omachonu on the basis of her race or national origin -- and they cannot on this record -- Bunte cannot be held liable here because the process attendant to the ultimate decision to deny Omachonu tenure, however flawed, was so layered with independent decision makers as to erase any arguably causal link.

## II. Defendant Throop

Plaintiff does not even attempt to attribute any discriminatory animus to defendants Throop or Shields (Pl.'s Opp'n Br. (dkt. #46) at 39), leaving unclear the basis

for holding defendant Throop liable under § 1983. As already discussed, § 1983 liability is premised on individual's personal involvement in causing or participating in a constitutional violation. *See Hildebrant*, 347 F.3d at 1039. There is no dispute that Shields was the individual with the sole responsibility to decide whether Omachonu should receive tenure.[10] At most, plaintiff alleges that then Education Dean Throop prepared a memo explaining her independent recommendation against extending tenure to Omachonu, which was one of the materials upon which Chancellor Shields relied in reaching his decision to deny tenure, just as she relied on a similar recommendation by the former Education Dean and current UWP Provost Den Herder. But even assuming that Throop could be held liable for arguably causing Shields to deny tenure based in part on her recommendation, which plaintiff alleges was tainted by Bunte's discriminatory animus, the claims against defendant Throop fail because Shields' independent review broke any casual chain.[11]

## III. Defendant Shields

Plaintiff questions the meticulousness of Chancellor Shields' independent review of her tenure file based on his inability to recall specific items it contained some years later at his deposition offers no genuine evidence that Shields failed to conduct an

---

[10] To be more precise, Chancellor Shields was the individual responsible for making a tenure recommendation to the Board of Regents, but as the parties acknowledge implicitly, that nuance is immaterial here.

[11] Although unnecessary for the grant of summary judgment in favor of this defendant, defendants also point out the evidence shows that Dean Throop issued similar recommendations against tenure for at least two white, American-born males and has dismissed at least two others for incompetence. (Defs.' Opening Br. (dkt. #36) at 15-16.)

independent review of the materials in her file.  To be sure, while there is no dispute that Shields never talked to retired Dean Bunte about Omachonu, defendants concede that Shields *did* consider Bunte's memos and letters highlighting Omachonu's negative student evaluations and criticizing her teaching effectiveness in reaching his tenure decision.  The factual record also demonstrates, however, that before making his initial decision whether the plaintiff was a suitable candidate for tenure, additional materials that were likely in Omachonu's file included "her descriptions of what she had been up to, syllabi, her research, [and] . . . documentation that she received her doctoral degree," which generally left him "underwhelmed."  (Dep. of Dennis J. Shields (dkt. #26) at 31:7-14.)  Additionally, Chancellor Shields met with the tenured School of Education faculty to discuss why they had rescinded their statement regarding concern about Omachonu's teaching effectiveness, and plaintiff does not assert that those faculty members expressed particularly strong support at that meeting.  Moreover, to the extent that Dean Throop's recommendation against tenure was influenced in part by Bunte's assessments, there is also no dispute that Throop's review of Omachonu's candidacy for tenure included her own, independent assessment of negative student evaluations through the fall of 2012 semester *and* conclusion that Omachonu's scholarship was not up to par, both of which she addressed in her memo to Shields.

Furthermore, after Omachonu appealed Shields' decision, Provost Den Herder prepared her own memo and timeline for Shields, which summarized events and communications related to Omachonu between her hiring in December of 2007 and her May 9, 2013, letter purporting to rebut concerns raised by Shields.  (Den Herder Decl.,

Ex. M (dkt. #31-3).) Chancellor Shields also met with Omachonu for approximately one hour, during which he considered additional materials that she submitted, including information regarding her teaching strategies and an audio clip of her interacting with students in the classroom. Finally, Omachonu got one last chance to make her case before an ad hoc committee organized to consider her appeal, which also found an adequate basis for Shields' final decision denying tenure.

Plaintiff understandably suggests that a more robust tenure review process would have incorporated in-classroom evaluations of her teaching ability, but as the Seventh Circuit has noted repeatedly, a court reviewing a plaintiff's employment discrimination claim does not sit as a "super personnel review board" with the authority to scrutinize an employer's process in reaching a legitimate employment decision. *See Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005). Ultimately, apart from Bunte's dated inputs, the independent backstops that bolstered Chancellor Shields' tenure determination for Omachonu, while imperfect, were more than enough to wash away any reasonable claim of discriminatory intent by Bunte that may have infected the process. *See Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 352 (7th Cir. 2009) ("[A]n independent investigation by the decisionmaker weighs heavily against a finding of excessive influence."); *id.* (holding that the plaintiff could not maintain a cat's paw claim when the decisionmaker "reviewed multiple sources of information on his own, held at least three meetings and received [an] independent recommendation before deciding to fire [her]"); *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 918 (7th Cir. 2007); *see also Taleyarkhan v. Trs. of Purdue Univ.*, 607 F. App'x 548, 551 (7th Cir. 2015).

Finally, plaintiff fails to demonstrate that Dean Throop, Provost Den Herder and Chancellor Shields' reasons for recommending against tenure were pretextual. Throughout her summary judgment briefing, plaintiff argues that the negative student evaluations that defendants emphasized heavily were tainted by bias against her race and national origin. In support of this assertion, plaintiff points to literature reflecting the notion that student evaluations are imperfect measures of teaching effectiveness because they can reflect discriminatory biases, as well as contemporaneous incidents of racial hostility at UW-Platteville. She also stresses that she received a number of glowing student evaluations. The court does not reject the possibility that at least some of the negative evaluations were sufficiently biased to be unreliable, however, plaintiff cites no case law, nor could the court find any, standing for the proposition that an adverse employment decision influenced in part by the possibly racially-biased student evaluations could support a discrimination claim by itself. In addition, even though plaintiff underscores that Dean Throop was generally aware that there exists literature that race and gender biases have the tendency to skew student evaluations downwards (Pl.'s Opp'n Br. (dkt. #46) at 37), she still does not present enough evidence for a reasonable jury to find that Throop or Shields did not honestly believe the reasons they provided for recommending against tenure, which included other considerations besides low evaluations.[12]

---

[12] Because plaintiff's proposed facts regarding bias underlying the negative evaluations are not enough for her to survive summary judgment, defendants' motion to strike (dkt. #49) is denied as moot.

The Seventh Circuit has recognized that in the context of tenure denials, demonstrating pretext is "an extremely difficult burden to carry due to the layered and subjective nature of the tenure process, and the court's recognition that such decisions are based on the fine distinction between competent and superior achievement."[13] *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 814 (7th Cir. 2007) (alteration and internal quotation marks omitted); *see also Blasdel v. Northwestern Univ.*, 687 F.3d 813, 815-16 (7th Cir. 2012) ("[P]ractical considerations make a challenge to the denial of tenure at the college or university level an uphill fight -- notably the absence of fixed, objective criteria for tenure at that level.") (collecting cases). Again, though the possibility, even likelihood, that some student evaluations may have been contaminated by racial and ethnic bias is troubling, the court may not second-guess the correctness of Chancellor Shields' tenure decision on that basis, nor in fairness is there any evidence that Dean Throop and Chancellor Shields did not consider studies supporting that possibility in deciding how much weight to give student evaluations.

---

[13] With this heavy burden in mind, plaintiff's argument that defendants overemphasized student evaluations in contravention of Board of Regents policy (Pl.'s Opp'n Br. (dkt. #46) at 37-38) also falls short, particularly in light of her inability to point to comparators outside of her protected classes who were treated more favorably.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #27) is GRANTED.

2) Defendants' motion to strike (dkt. #49) is DENIED as moot.

3) The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 5th day of March, 2018.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge